The court will proceed to the second case, the United States v. Ginsberg. Mr. Nash. I please the court, Michael Nash v. Scott Ginsberg. This is a criminal case, a fraud case, bank fraud. In the opening paragraph of the government's argument in its brief, it quotes two cases of this court which state, intent to defraud requires a willful act by the defendant with the specific intent to deceive or cheat. The uncontradicted evidence in this case is that the banks knew exactly what these loans were about, and the fact that Mr. Ginsberg was receiving from the bank proceeds. If you look at our appendix C, you'll see that the HUD settlement statements are there. On each of those statements, it states that Mr. Ginsberg is getting between $35,000 and $41,000 from the loan proceeds. The first one says $35,900, and the others say similarly. The banks all reviewed these statements. The uncontradicted testimony of the government witnesses, the bankers, Mr. Husted of Indy America, Mr. Lockwood of Wells Fargo, and Mr. Chase, or Mr. Koch of Chase, all testified that they reviewed those settlement statements prior to approval and prior to funding. You say the banks knew all about these, we'll call them straw buyers? I wouldn't call them straw buyers. What the court calls them. Pardon me? What do you call them? They were the buyers. They intended to repay the mortgage. They all said they understood the obligations they had. They all tried to pay them, I think, for about a year and a half before the deal collapsed. Did any of them go through with that? Make all the payments? No, any of them. I believe three or four units were sold by the buyers, but that was not an important part of the trial. It wasn't accented by the government, except that they all caved. All the loans went into default, except for three or four, I believe. But the banks knew what they were getting into. The government's brief says it on page 16. This is the government's brief. The witnesses discussed, those bankers I just mentioned, discussed the underwriting process for the mortgage loans, including the information and documents considered by the banks as part of the underwriting process. And the considerations that went into funding the loan, including the bank's review and approval of the settlement statement, which all contained Mr. Ginsburg getting these monies, prepared by the title company prior to funding the loan. That's the government's brief, page 16. Page 19. At the time of the closing, the banks all required that the title company provide it with a draft of the settlement statement before approving the funding of the loan. That's the government's brief, page 27. Likewise, each settlement statement prepared at the time of closing and subsequently submitted to the banks prior to approval of funding. Halstead said, which is very important considering what happened, that what the banks were doing was they were making the loans, bundling them, and then selling them. So contrary to what would have happened 50 years ago when you walked into Tallman Savings to get a loan and Tallman maybe knew who you were, they weren't looking to that lender to get repaid. They were going to bundle it and sell it. So their considerations of what they were doing were much different than we might normally consider. They weren't at risk. Whoever bought the loan would be at risk. So their underwriting process was lax, and all the bankers acknowledged that. I believe it was Mr. Halstead who said, we wouldn't have even looked at that. That didn't matter to us. Well, Mr. Nash, is there any evidence that the banks knew about, if it matters, the incentive situation between the buyer-seller and Mr. Ginsburg? There was a fax that Mr. Ginsburg's, I say Mr. Ginsburg, they say his office, sent to the banks that said, I'm getting an incentive fee. Government took issue with whether it was a consulting fee or an incentive fee. I submit that Shakespeare said it right. A rose by any other name still says sweet. Are they going to say they approved the loan because they thought it was a consulting fee? Not an incentive fee? That's ridiculous, on its face. No loan officer, no underwriter, no banker testified we were deceived. They couldn't be. There was no banker to cross-examine about the monies that they knew Mr. Ginsburg was getting. It was a woulda, coulda, shoulda. We might not have made this loan if we'd been observing good banking practices. We shouldn't have made this loan. How many banks were involved? Well, seven, eight, or nine. They offered witnesses from four banks only. So these banks didn't talk to each other, apparently. Well, they were all there. They all had the same agent for Republic. And the evidence in this case is that Republic was the bank's fiduciary. How did they get from under that? The point is, it's not that they didn't notice what was happening. It's whether Ginsburg had the intent to deceive and cheat the bank. He didn't conceal anything. He was at all the closings. Every settlement statement stated he was getting the money. They knew that the loan proceeds weren't going to the seller of the property. They were going to Mr. Ginsburg. So if that was a big, important issue for them, why didn't they do something? They didn't, and they knew it. The Republic closer testified, the government's first witness in the case, testified, we send those settlement statements to the banks so they can review them prior to closing and make any changes. There's no evidence that Ginsburg concealed anything from them. If there were ever the monkey that see no evil, hear no evil, do no evil, it was these bankers. And the reason is simple. They weren't going to be on the hook. They were going to bundle them and sell them, and as Mr. Hulstead said, and then sell them, and then make more loans, similar loans. And we all know that's what happened. Well, they say in here that Ginsburg got somewhere around $350,000, was it? I think it was even more than that. Okay. Much of it went back when they tried to make the payments and keep up the loans. No, wait, how much did he get to keep, or how much did he keep? $350,000 sounds okay to me. Okay, so he kept his money. Yep. Okay. That's all part of it. And he somehow or other kept this by going, by showing up everywhere. I have to acknowledge that somebody had their eyes closed, but Mr. Ginsburg had his eyes wide open, as you put it. Pardon me? Mr. Ginsburg had his eyes wide open, and he knew where he was going, and he knew where the money was going to end up. So the banks. Yeah. He didn't intend to conceal or deceive anybody. He told them right up front what was happening. We're all of a mindset that the banks are going to think we shouldn't make this loan. The government says, the last paragraph of its brief, it says that Ginsburg should have known these were bad loans because these borrowers couldn't afford it. Well, wait a minute. That's the bank's job. He's not supposed to make that judgment. The bank will make that judgment. And these banks were making, I think IndyMac made five loans on the same day to the same lender, borrower. Chased the same way. Were those all Ginsburg's? All Ginsburg's. All the loans in this case are Ginsburg's. There's no evidence. It's not a case of a little bit of evidence. The uncontradicted evidence is that the banks knew exactly what was going on. So they couldn't be defrauded. They can't be defrauded. And the funny thing is, it's not funny really. These loans were made in 2007. In 2014, the banks decide, oh, we've been cheated. Seven years later. The second point that I make is the hearsay testimony of the banker on the phone with the non-testifying witness, Diane Phillips. He testified, not being in the courtroom, double hearsay, that we closed it because it was multiple lenders. And in that colloquy between the witness, who was Ms. Wellborn, she testified, well, Diane was on the phone with him, and he said he was going to stop the loans. Then the court asked, well, did he say why? And the witness said, because there were multiple loans. That wasn't for the truth of the matter asserted. Pardon me? That wasn't for the truth of the matter asserted, right? Sure was. No, that's explaining why the bankers took the action they did. But they're yet to show that the banks, this witness, who's not this banker, is stopping the loans because there were multiple loans to the same client. I understand why it was prejudicial, but it seems to me like that would have been a 403 problem. Well, we raised 403 in our brief. 403 wasn't raised downstairs, but you can consider that anew here. I don't think anything could be a more classic example of hearsay. The banker got to testify, even though he wasn't there, that loans to multiple buyers of multiple properties is wrong, and that's what the jury heard. And the judge, the district court judge, knew exactly what that meant. To her, that meant that Ginsburg was doing something wrong or something fishy, and he, Ginsburg, is responsible for it. So we didn't even have to imagine the prejudice. The judge has set it out in the record. But what? What did he do to conceal the facts of these loans to the bank? Not a thing. If you have no more questions, I hope I have some time left. Thank you. Thank you, Mr. Nash. Mr. Young? May it please the court, good morning. Rick Young, appearing on behalf of the United States. The defendant cannot meet his burden to show that the jury's verdict was unreasonable or that the record is devoid of evidence to support that verdict.  The defendant participated in this scheme knowingly and did so with the intent to defraud in order to obtain over $4.8 million in mortgage loans for the buyers he recruited to purchase those condominiums and in order to allow him to walk away with approximately $385,000 from these transactions from the proceeds of those loans. This scheme was centered upon that incentive payment, the incentive payments that the seller of those condominiums secretly agreed to pay to the defendant's buyer, and the scheme was centered on the need to conceal that payment from the lenders. Mr. Nash suggests it was uncontradicted that the lenders knew about these incentive payments and the true nature of these incentive payments. I think he's misconstruing the documents. The documents certainly show that a fee was paid as part of these closings to Mr. Ginsberg, but they don't disclose what it was, that it was an incentive payment. And perhaps I should cite best the words of defendant's counsel at closing when he said, in this case, there was the Second Amendment. Now, you've heard from the bank people, well, the content of the Second Amendment is not something that they would have approved. I don't disagree with that. Defendant's counsel at closing argument. The evidence was uncontradicted that the lenders would not have approved the payment of an incentive fee had they known of it. Is it just the definition of it or is it something else? Incentive or whatever else they want to call it. The bank witnesses at trial testified that a seller is not permitted to provide funds back to a buyer as part of a closing or real estate transaction with a limited exception for closing costs, small fees as part of the closing. They cannot provide cash back. They cannot provide money for a down payment. And they cannot provide any type of inducement or enticement fee to the buyer. They explained the reason for that is that it calls into question what the sales price actually is of the property. If the buyer is getting money back out of the transaction, he's not really paying the sales price that is listed on the contract the settlement statement and all the other documentation. And the sales price is a very significant factor in underwriting the loan because a lender will not fund a loan if the sales price, if the loan amount exceeds the sales price. They're not going to give you, in other words, they're not going to give a buyer more than he's paying for the property. And if you look at each of the transactions here, if you take into consideration the fact that that consulting fee, as it's labeled on the documentation, falsely, if you subtract that from the sales price, that's exactly what was happening. The lenders were providing loans for more than the true sales price of the property. It was reasonable for the jury to conclude that the defendant, knowingly with intent to defraud, participated in this scheme because the documentation falsely labeled that amount being paid as a consulting fee, not what it really was, which was an incentive payment, as it is explicitly described in the Second Amendment, signed by the defendant, the sellers, and the buyers. Now, that Second Amendment was never provided to the lenders in this case. It was kept in the files of the attorney representing the seller. But in any event, the paperwork provided to the lender misrepresented what that fee really was. It made it appear as if the defendant was a third party, independent third party, providing some type of consulting service to the seller, almost as if he was a vendor or a contractor. It is common, for example, for sellers out of a closing to pay off third parties who have provided services in connection with the property, such as a mechanic or a renovation. That's exactly what this made it appear to be, some type of payment for services provided by Mr. Ginsburg, when in fact it was an incentive payment. And it also misrepresented where the money was really going and how it was being used. It was a payment intended for defendant's buyers, even though it was being paid to defend it. But that was concealed on the paperwork. And it was being used to cover the down payments. It was being used to cover money given back to the buyers, supposedly to use towards, at least in part, the mortgage payments. Did the sellers get the money, get money? In connection with each transaction, the sellers received no cash out of these transactions. What is the seller? I mean, I assume the seller had titled the property. Yes. And sold it and should have gotten some amount of money. Well, they had mortgages on the property. So the seller's proceeds were basically distributed among a variety of sources, the primary one being the lender who held the mortgages on the seller's property. So when they sold the property, obviously they had to pay off their mortgages. And then there were various miscellaneous fees. There was a real estate broker involved in the transaction. They got fees as well. But most of what would otherwise have been their profit was essentially taken up by the consulting fee that was being paid to the defendant. I would submit that in order to move the condos at this complex that weren't otherwise moving, they were willing to basically give up their profit in the transaction, give it back to the buyer. Just to get rid of it. Just to get rid of it. Now, the legitimate way they could have done that is to simply lower the sales price. But that wouldn't have worked. And it wouldn't have worked for the defendant because he needed that incentive payment. He needed that incentive payment to his buyers because the people he was bringing to purchase these properties were not wealthy individuals who could afford to purchase 20 to 25 properties each. These were individuals that he was essentially finding on the street  and he was bringing them into these transactions with promises. Promises that they would not have to put any of their own money towards the transaction. They wouldn't have to pay a down payment. They wouldn't have to worry about the mortgage payments they can use in part the money he was kicking back to them after the transactions to cover those sales. Counsel in his brief is correct that the defendant was not the person, Mr. Ginsberg, was not the person responsible for preparing the settlement statements. That was the title company. Nevertheless, he attended each and every closing. And at each and every closing, the testimony established that he reviewed the paperwork. He's blaming that on the banks. He said the banks knew what was going on. Whatever that is. The banks knew that there was a fee being paid to Ginsberg and Associates, but they didn't know what that payment represented. It represented a consulting. Apparently all these properties were pretty well leveraged. I think that's fair to say, Your Honor, yes. And a lot of the owners are recognizing that and this is a way to get those obligations wiped out. And even though they may not have got any net, it wiped out other obligations. I don't know. That's all I can understand why a seller would go through all this. Yeah, as I said, Your Honor, I think it was, and the evidence at trial indicated that the sellers were desperate to move these properties. So they were willing to basically, you know, take nothing out of the deal in order to do so. But in terms of the banks as well, it's important to realize that this is a bank fraud case. The intent that matters is the intent of the defendant. You know, Mr. Nash suggests the banks were perhaps reckless or negligent in some instances. I certainly disagree with that, but even if that is correct, that doesn't matter. You can't blame the victim of the fraud for not being more alert or more attuned. What matters is the intent of the defendant, and clearly he intended to defraud those institutions, he and the others involved in these transactions, because otherwise they wouldn't have labeled it a consulting fee. They otherwise wouldn't have taken steps to hide the fact that those money were being used to pay the down payments in connection with these transactions. You know, each and every one of these transactions required a down payment ranging from approximately $8,000 to $20,000. The defendant was directing the proceeds of the consulting fee that was being paid to him that was really an incentive payment to pay those down payments. That's not reflected on any of the paperwork. Now, I acknowledge that there was a title company involved in these transactions, and the title company is a fiduciary of the bank, but the fact is the testimony established that the title company utterly failed in its responsibilities to those lenders. But that failure does not excuse the defendant's conduct, the fact that he and others took advantage of an incompetent or corrupt title company in order to deceive the lenders about these transactions. And it's also noteworthy that even though the evidence relating to the incentive payment and the way it was masked from the lenders by calling it a consulting fee, the fact that the defendant distributed that amount to pay the down payments for the buyers, which once again banks expect the buyer to pay the down payment, not someone else, even though that is in and of itself sufficient to support the jury's verdict, there's also the fact that the scheme involved misrepresenting the qualifications of the buyers, their income and their assets, because these were people, as the defendant was certainly aware, who couldn't afford to buy 20 to 25 properties each, an IT worker who made $70,000 a year, or I'm sorry, I think about $90,000, a school teacher who made about $70,000. He referred them to mortgage brokers, and they were largely responsible for the loan applications, that's true, but he certainly knew what was going on and he facilitated it when necessary. He told one of his buyers, Judith Ellis, when there were issues with the application getting approved, you need to bump up your income, prompting her to create a fictitious tutoring business. He added two of the buyers to his bank accounts, Martin Swidler and Judith Ellis, he added their names to his bank accounts in order to make it appear that they had money, money to come to the table to close with. The evidence was overwhelming that the defendant participated in this scheme and that he had an intent to defraud. With respect to the defendant's second argument regarding the testimony of the closer on cross-examination as part of the defendant's case, the closer simply testified that she was instructed to end the transactions and explain the reason why she ended those transactions. That was appropriate for understanding, to put into context, not only why the closings were abruptly ended, but also defendant's response there too, which was not, what do you mean the closing's shutting down because the lender has an issue? It wasn't trying to determine what's going on. It was to push through with the closing. Come on, work your magic. Let's close this deal. Was there any connection to the title company, the closer? The closer worked for the title company. Yeah. Yeah, and she testified that she'd never seen anything like this before. She had concerns. She should have told the lender about the fact that money from the consulting fee that was really an incentive payment was being used to pay the down payments, but she didn't. She was pushed into doing this from her lenders and utterly from her bosses, and she failed in her capacity. The title company, then, they're not a party to this. Nobody sued them, right? The title company is not a party to the criminal action. It's not part of the record. There was some litigation underneath related to the title company, and the title company was barred, and they're no longer in business. They closed, but that's not part of the record, just to be clear. It was not certainly introduced at trial in any capacity, but in my closing time, I just want to note that I disagree with defendant's contention that it was hearsay. Although the closer, at one point in time during her testimony, began to talk about what had been told to her by another closer, she later testified that the lenders told us. This was a small closing. Multiple closers were present. She talked about what she was told. Specifically, at page 615, she was asked, did the lender tell you not to close the loan? Yes. Eventually, that's what the lender told us, not to close the loan, told us. There was no objection to that specific question or answer to foundation or hearsay. She was testifying, as the record reflects, about something that was apparently told to her. She then talked about her understanding of what occurred. Specifically, at that same page, do you know why the lender told you? Because that's when the lender found out there were multiple transactions under the same name. Again, no objection as the foundation or hearsay with respect to that particular question. There were three people, right? Three so-called buyers? There were three buyers who testified at the trial. Some had more than others. I said somebody had more than 10. Is that right? Gregory Callahan purchased 20 properties over the period of about two months, financed by nine different lenders. Judith Ellis purchased 10 properties over the period of approximately six weeks, financed by four different lenders. And Martin Swidler purchased two properties on one day, financed by one lender, Chase Bank. So with that, I see my time is up. If there are no further questions, the United States would ask that the court affirm the conviction of the defendant. Thank you for your time and attention. Thank you, Mr. Yost. Mr. Nash. In the government's argument, a key question was asked by Your Honor Judge Mannion about whether this was a disagreement about semantics, consulting to be versus incentive fee. And the government plays that off and says, well, they listed it as a consulting fee and gave some examples of what it could be. There's nothing in the record about anything like that. The fact is the banks knew that Ginsburg was getting the money. Ms. Welburn testified that everybody at the closing knew that he was getting the money, that he was supplying the down payments. The government concedes that the closer, the title company, was the bank's fiduciary. The banks got all those settlement statements. It said $35,000, $41,000 going to Ginsburg. Were they deceived because it said consulting fee? Wait a minute. These are the proceeds of our money that should be going to the seller. This is a price. It would be any different if they had said incentive fee. The price, according to the government's logic, would still be less for the condominiums. The banks knew what was going on. Their case is dependent on his effort to deceive and cheat the banks. There's no evidence of that. The evidence is uncontradicted that he told them about the money that he was getting. He sent them a fax that said it was an incentive fee. He says that the banks were negligent. I don't think, given the standards that were existing in 2007, that they were doing anything different than every other bank was doing at the time. And to know that people couldn't afford it, anybody that walked in Chicago's Loop wondered in 2006, 2007, and 2008, who were buying all these luxury apartments for $300,000? Well, we found out. There was no effort by him to conceal, and that's the uncontradicted evidence. He says the bank witnesses testified they wouldn't have, they shouldn't have, and that's what this case is. So whatever, then that is what the banks' negligence, or whatever you want to call it, legalized what he did? He didn't do anything wrong. He told them up front, listen, I'm going to get $31,000. I'm sorry. He would get $35,000 to $41,000. The banks knew that. The banks wanted to lend the money, bundle it, sell it, then take that money back and do it again and again and again. They were eager. Negligent? Probably so by today's standards and what should have been the standards then, but the word really describes what they were, was greedy. They wanted to make these loans, and they didn't care that he was getting the money. Seven years later, they decide differently, or the U.S. attorneys decide differently. But he didn't do anything to conceal anything. Welburn said we all knew it. How can they shoulder the burden of intent to deceive and cheat? A specific intent, an act to deceive them. Are they going to say because the title company put down consulting fee instead of incentive fee, that makes it fraud? Nonsense. Thank you. Thank you, Mr. Nash. Thank you, Mr. Young. Case is taken under advisement.